## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JENNIFER CASO and** | : | |
| **JENNIFER REBOVICH,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **3:13-CV-02253** |
| | : | **(Judge Mariani)** |
| **LUZERNE COUNTY and** | : | |
| **MICHAEL VECCHIO,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiffs Jennifer Caso and Jennifer Rebovich allege that Defendants Luzerne

County and Michael A. Vecchio discriminated against them on the basis of their gender in

violation of the Equal Protection Clause of the Fourteenth Amendment, Title VII of the Civil

Rights Act of 1964, and the Pennsylvania Human Relations Act ("PHRA"). (*See* Am.

Compl., Doc. 31). Defendants then filed a Motion for Summary Judgment (Doc. 41), which

is pending before the Court. For the reasons set forth below, the Court will grant the Motion.

## II. FACTUAL BACKGROUND

### A. Statement of Facts[1]

Plaintiffs Caso and Rebovich were probation officers with the Luzerne County Probation Services Department. (*See* Rebovich Dep., Defs.' App., Ex. F, Doc. 44-6, at 16:5-12; Caso Dep., Defs.' App., Ex. G, Doc. 44-7, at 6:24-7:2). The Plaintiffs were appointed by then-President Judge of the Luzerne County Court of Common Pleas, Michael Conahan, a jurist who was later criminally prosecuted and who now serves a federal prison sentence. (Rebovich Dep. at 16:7-9; Arbitration Opinion & Award, Defs.' Ex. M, Doc. 44-13, at 8). Defendant Vecchio is the Director of the Probation Services Department, and was appointed to that position by another former Court of Common Pleas President Judge, Chester Muroski. (Appointment of Michael Vecchio Order, Defs.' App., Ex. C, Doc. 44-3, at 1).

In January 2012, Vecchio became aware that the Luzerne County Council would be cutting the Probation Department's funding "due to a budgetary crisis." (*Id.* at ¶ 18).[2] In

---

[1] Plaintiffs dispute nearly every one of the facts listed in Defendants' Statement of Facts. However, a review of the record indicates that many of these "denials" do not stem from genuine factual disputes, but instead from mischaracterization, misdirection, or obfuscation of the points at issue. So as not to allow these answers to derail the Court's consideration of the pending Motion, our statement of facts recounts those facts which the record shows are not in reasonable dispute, with explanatory footnotes when appropriate.

[2] In response to Paragraphs 18 through 22 of Defendants' Statement of Facts, Plaintiffs reply only: "Denied as stated. Documents speak for themselves. This case is not about any budget cuts, but rather were Plaintiffs, two females with more seniority then [*sic*] the remaining men, were [*sic*] discriminated against." (Pls.' Statement of Facts, Doc. 48, at ¶¶ 18-22). But Defendants' statements do accurately state the cited portions of the record. Because Plaintiff admits that the documents speak for themselves and points to no other record evidence contradicting these statements, the Court accepts Defendants' statements as true.

2012, the Council reduced the Department's operating budget from $9,267,999.00 to $8,780,177.00. (*Id.* at ¶ 19). The funds allotted for Probation Department salaries were reduced from $6,051,029.00 to $5,595,593.00. (*Id.* at ¶ 20). In light of these budgetary reductions, the Department was required to reduce its staff. (*Id.* at ¶ 21). Accordingly, the Common Pleas Court instructed Vecchio to develop a recommendation for a reduction in force. (*Id.* at ¶ 22).

As part of these reductions, Vecchio recommended that five probation officers be furloughed: three men (James DeJoseph, William Sharkey, and Jonathan Veet) and two women (Plaintiffs). (*Id.* at ¶ 51). The Court of Common Pleas accepted his recommendation. (*Id.* at ¶ 58).[3] Its Human Resources Administrator then sent the Plaintiffs letters informing them that they were being furloughed "[a]s a result of a reduction of funding in the 2012 Luzerne County Budget[.]" (Paul McGarry Letter, Pls.' Ex. E, Doc. 47-6, at 1-2). The furloughs were effective March 1, 2012. (*Id.*). Plaintiffs' last days of work were both on February 16, 2012. (Doc. 42 at ¶¶ 65, 67).

---

[3] Plaintiffs denies paragraph 58 without explanation and denies paragraph 51 as follows: "Denied. Chief Vecchio decided to discriminate against women by laying off women who had more field experience and seniority than retained males." (Doc. 48 at ¶ 51). This is a legal conclusion that the Court need not credit. Moreover, the evidence of record to which Plaintiffs points to dispute these statements actually support the statements at issue. Plaintiffs' Exhibit F, Plaintiffs' grievance slips, stated that Vecchio informed them that they were being "laid off due to staff reductions," though the Plaintiffs believed such statement to be untrue. (Grievance Slips, Pls.' Ex. F, Doc. 47-7, at 1-2). Plaintiffs' Exhibit H also lists as Grievants four out of the five individuals that Plaintiffs' Statement of Facts denies were to be furloughed. (Mgmt. Resp. to Grievance, Pls.' Ex. H, Doc. 47-9, at 1). The Arbitration Opinion and Award submitted to the record also names these five individuals as Grievants whose employment with the Probation Department was terminated by the Luzerne County Council upon recommendation of Michael Vecchio. (*See* Doc. 44-13 at 1). A sworn affidavit by Luzerne County Court of Common Pleas Court Administrator Michael Shucosky states the same. (*See* Michael Shucosky Aff., Defs.' Ex. BB, Doc. 44-28, at 11). Therefore, the Court finds ample uncontradicted evidence of record to conclude that the cited statements are true.

On February 17, 2012, Plaintiffs filed grievance pursuant to the Collective Bargaining

Agreement ("CBA") between Luzerne County and the Luzerne County Court Appointed

Professional Employees Association. (Doc. 47-7 at 1-2). Article XVII of the CBA, entitled

"Discharge, Demotion, Suspension, and Discipline," provides,

> The Court retains the sole and exclusive right to discharge, demote, suspend
> or discipline Employees. All actions taken by the Court pursuant to this Article
> shall not be subject to grievance and arbitration procedure of this Agreement,
> but rather shall be taken up in accordance with the Court Policy and
> Procedure Manual. This Article shall not serve to diminish any Employee
> rights under law or the Court Policy and Procedure Manual.

(CBA, Pls.' Ex. B, Doc. 47-3, at 12).

> Under Article XXX, section 3, entitled "Management Right," the CBA states,

> All matters involving the rights of the Court to hire, discipline, discharge,
> supervise, assign or direct the members of this bargaining unit are vested
> exclusively in the Courts and are not subject to any terms or conditions of this
> collective bargaining agreement.

(*Id*. at 20).

On March 9, 2012, Max Blaskiewicz, Luzerne County's Collective Bargaining Officer,

responded to a grievance filed by Plaintiffs and two of the other furloughed male employees,

and denied it. (Luzerne County Resp. to Greivance, Pls.' Ex. H, Doc. 47-9, at 1). The

grievance proceeded to arbitration. (*See generally* Arb. Op. & Award, Defs.' Ex. M, Doc. 44-

13). The Grievants at arbitration included all five furloughed employees: the Plaintiffs and

the three men. (*See id.* at 2). After a hearing before an impartial arbitrator, (*see id.* at 3), the

grievance was again denied, (*id*. at 16-17).

4

## B. Defendants' Version of the Facts

Defendants argue from these facts as follows.

The Probation Department is a division of the Court of Common Pleas. (Doc. 42 at ¶ 1). The Court of Common Pleas is an entity separate and apart from Luzerne County. (Id. at ¶ 9). The Court has its own human resources department, which operates independently of the County's human resources department, as well as its own Human Resource Policy and Procedures Manual. (Id. at ¶¶ 14-15). It also conducts its own performance evaluations for Probation employees. (Id. at ¶ 13). The payroll for Probation employees is maintained by the Probation Department's Collections and Administrative Services Division. (Id. at ¶ 17). The County is not involved in the Probation Department's daily activities. (See id. at ¶ 11).

Therefore, Vecchio and other members of the Probation Department are employees of the Court of Common Pleas and not of Luzerne County. (Id. at ¶¶ 3-5). The County has no authority over Vecchio's employment. (Id. at ¶ 10). Instead, Vecchio's immediate supervisor is Michael Shucosky, the Common Pleas Court Administrator, whose supervisor in turn is the Common Pleas President Judge. (Id. at ¶ 7).

According to Defendants, Vecchio's recommendation to furlough Caso, Rebovich, DeJoseph, Sharkey, and Veet "was based on the operational needs of the Department of Probation Services, vis-à-vis, the skills, years of experience, including field experience, and credentials of the officers of the Department of Probation Services." (Id. at ¶ 23). One particular factor that entered into Vecchio's reduction-in-force decision was whether the

5

probation officers were certified as "Control Tactics and Use of Force" ("CTUF") instructors. (See id. at ¶¶ 54-55). According to the Defendants, "[m]aintaining in-house certified 'Control Tactics and Use of Force' instructors saves the Department of Probation Services significant annual costs that would otherwise be spent on third party trainers." (Id. at ¶ 47). These in-house CTUF instructors help the Probation Department formulate its use of force policies, (see id. at ¶ 48), and also appear to train other probation officers. (id. at ¶¶ 37-43).

The Probation Department offers CTUF training several times per year. (Id. at ¶ 45). The in-house CTUF training instructors volunteer for the training and receive no compensation for the time spent becoming certified or providing training. (Id. at ¶ 46). According to Defendants, "the services of the in-house 'Control Tactics and Use of Force' instructors are necessary to the effective and efficient operation of the Department of Probation Services." (Id. at ¶ 49).

In making his furlough decisions, Vecchio chose to maintain four CTUF instructors. (Id. at ¶¶ 55). None of the probation officers Vecchio recommended to be furloughed were certified as CTUF instructors. (Id. at ¶¶ 25, 30, 32, 34, 36, 51).

Moreover, Vecchio testified during his deposition that Plaintiffs and other female probation officers were not prevented from volunteering for CTUF training. (Michael Vecchio Dep., Doc. 47-25, at 82:7-25). According to Vecchio, his reduction-in-force recommendation was not based on gender. (Id. at ¶¶ 85:25-86:7).

6

Finally, Defendants argue that the Court of Common Pleas made the ultimate furlough determination and that no Luzerne County officials were involved in the decision. (*Id.* at ¶¶ 58-59).

## C. Plaintiffs' Version of the Facts

Plaintiffs deny that Luzerne County was uninvolved in the furlough decision. (Doc. 48 at ¶ 59). According to Plaintiffs, Probation Services is a department of the County, and not of the Court of Common Pleas. (*See id.* at ¶¶ 1-5). As a result, Plaintiffs indicate that they, along with Vecchio and other Probation employees, were County employees. (*See id.* at ¶¶ 2-4). Plaintiffs note that Luzerne County's representative, David Parsnik, admitted (before later amending his testimony) that Plaintiffs were employees of the County. (*Id.* at ¶ 4 (citing David Parsnik Dep., Pls.' Ex. U, Doc. 47-22, at 11:17-23)).

In support of these contentions, Plaintiffs cite their job applications, Luzerne County's Home Rule Charter, various employment documents, and the CBA. When they applied for employment with the PSD, Plaintiffs filled out job application forms that use letterhead emblazoned "Luzerne County Office of Commissioners." (*See* Application for Employment, Pls.' Ex. A, Doc. 47-2). Moreover, Luzerne County's Home Rule Charter provides that all employees of the judiciary "shall be subject to the County's annual budget appropriations for judicial functions, Personnel Code, other personnel policies, Accountability, Conduct, and Ethics Code, purchasing and acquisition procedures, procedures for the disposition of County property, and all other relevant provisions of the Administrative Code." (Luzerne

County Home Rule Charter, Pls.' Ex. C, Doc. 47-4, § 6.05.B). Plaintiffs also point to various

employment documents that state that use the name "Luzerne County" in referring to the

employer, without specifically mentioning the Court of Common Pleas. (See Pl.'s Br. in Opp.

to Mot. to Dismiss, Doc. 47, at 4-5).

In asserting that the County was their employer, or at least involved in the furlough

decision, Plaintiffs heavily rely on the CBA and the fact that Plaintiffs pursued a grievance in

accordance with the CBA. The CBA lists the County as the "Employer." (See Doc. 47-3 at

2). When Plaintiffs received notice that they were being laid off, the letters stated, in

pertinent part,

> This non disciplinary separation is taken in accordance with the rules and
> procedures prescribed in the collecting bargaining agreement, the Luzerne
> County Personnel Policy and the Luzerne County Courts Policy and
> Procedures Manual. . . .
>
> Based upon the collective bargaining agreement and the Personnel Policy,
> you may be eligible for retirement benefits under the county pension system.

(Doc. 47-6 at 1-2).

After being laid off, Plaintiffs filed grievances pursuant to the CBA. (See generally

Doc. 47-7). The grievances were forwarded to Robert C. Lawton, Andrew D. Check, and

Max Blaskiewicz—Luzerne County's Manager, Human Resources Director, and Collective

Bargaining Officer. (See Grievance Form, Pls.' Ex. G, Doc. 47-8, at 1). When the grievance

proceeded to arbitration, the County, as opposed to the Court, defended the decision to lay

off Plaintiffs. (Doc. 44-13 at 9-11).

Plaintiffs also dispute Defendants' contention that gender did not enter into the furlough decision. (Doc. 48 at ¶¶ 53-54). Plaintiffs argue that because male officers with less seniority—namely Officers Buss and Kijek—were retained when the Plaintiffs were furloughed, this creates an inference of gender discrimination. (Doc. 47 at 11-12 (citing (Dept. of Probation Services Seniority List, Pls.' Ex. D, Doc. 47-5)). Moreover, Plaintiffs assert that they had more field experience than some of the officers who were retained. (Doc. 42 at ¶ 23).

With regard to Defendants' stated rationale for laying off Plaintiffs—their lack of CTUF training certification—Plaintiffs assert that women were never offered opportunities to attain certification. (Doc. 47 at 15 (citing (Pls.' Ex. M, Doc. 47-14; Jennifer Rebovich Aff., Doc. 47-1, at ¶ 7)). Plaintiffs point to the fact that all of the probation officers that had CTUF training certifications were men. (Id.). They also rely on Rebovich's Affidavit, in which she states "[w]omen were never offered the Control Tactics and Use of Force training to be a certified instructor during my tenure with the Luzerne County Probation Department." (Rebovich Aff. at ¶ 7).

To the extent Defendants contend that retaining probation officers with CTUF training was in the Probation Department's financial interest, Plaintiffs respond that they also possessed certifications that would have saved the Department money. Rebovich testified during her deposition that she was certified to teach DUI classes and assist on victim-impact panels. (Rebovich Dep., Ps.' Ex. V, Doc. 47-23, at 6:16-7:9). In addition, she

9

averred that her certifications would have benefitted the Department financially. (Rebovich Aff. at ¶ 8).

Further, Plaintiffs argue that Vecchio's rationale for furloughing the Plaintiffs changed over time. Rebovich testified that when Vecchio was asked why male probation officers with less seniority than Plaintiffs were retained, his initial response was that the retained probation officers had more field experience than the officers furloughed. (Rebovich Dep. at 39:6-9). However, the Plaintiffs argue that they themselves had more seniority and field experience than the retained male officers. (See id. at 79:23-80:6). Allegedly, it was only later that Vecchio stated that CTUF training entered into his furlough decision. (See Doc. 47 at 12-13).

Finally, Plaintiffs allege that Luzerne County failed to train its supervisors as to how to avoid gender discrimination. (See Vecchio Dep. at 19:14-16; Parsnik Dep. at 14:23-15:14).

### III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine issue as to any material fact." Fed. R. Civ. P. 56(a). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir.1990). "As to materiality, . . . [o]nly disputes over facts that

might affect the outcome of the suit under the governing law will properly preclude the entry

of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505,

91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence

of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106

S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-

moving party must offer specific facts contradicting those averred by the movant to establish

a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct.

3177, 111 L. Ed. 2d 695 (1990). "Inferences should be drawn in the light most favorable to

the non-moving party, and where the non-moving party's evidence contradicts the movant's,

then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,*

974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed.

2d 659 (1993).

## IV. ANALYSIS

### A. Identity of Plaintiffs' Employer

As an initial matter, there is an issue as to whether Luzerne County is a proper

defendant in this suit. Defendants contend that the Court of Common Pleas was Plaintiffs'

employer under Pennsylvania law, and was, in fact, their only employer. (Defs.' Br. in Supp.

of Mot. to Dismiss, Doc. 43, at 15-18). Plaintiffs, conversely, assert that Luzerne County

was their employer, based on certain admissions that they construe the County and one of its witnesses as having made. (Doc. 47 at 2-3).

The issue is significant because, if the Court of Common Pleas was Plaintiff's true employer, then the Eleventh Amendment to the United States Constitution would operate to preclude Plaintiffs' lawsuit. The Eleventh Amendment provides that the "Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Supreme Court has interpreted the Eleventh Amendment to stand for the expansive proposition that "unconsenting States [are] immune from suits brought in federal courts by private parties." *Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 551 F.3d 193, 197 (3d Cir. 2008). This immunity extends even "to suits brought against a State by its own citizens." *Id.* at 198 (citing *Hans v. Louisiana*, 134 U.S. 1, 10 S. Ct. 504, 33 L. ed. 842 (1890)). By contrast, municipalities such as Luzerne County are not immune from private lawsuits. *See, e.g.*, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 701, 98 S. Ct. 2018, 2041, 56 L. Ed. 2d 611 (1978).

On the issue of the Common Pleas Court's status within this framework, the Third Circuit has held "that Pennsylvania's judicial districts, *including their probation and parole departments*, are entitled to Eleventh Amendment immunity." *Haybarger*, 551 F.3d at 198 (citing *Benn v. First Judicial Dist. of Pa.*, 426 F.3d 233, 241 (3d Cir. 2005)) (emphasis

12

added). This is because the Pennsylvania Constitution provides that "[t]he judicial power of the Commonwealth shall be vested in a unified judicial system consisting of . . . courts of common pleas" among others. Pa. Const. art. V, § 1. In other words, "[t]he Commonwealth vests judicial power in a unified judicial system and all courts and agencies of the UJS are part of the Commonwealth government rather than local entities." *Haybarger*, 551 F.3d at 198 (internal citation omitted). Luzerne County's Home Rule Charter—which the Plaintiffs themselves submitted to this Court—states the same, providing:

> The judicial power in Luzerne County is vested in the Court of Common Pleas of the 11th Judicial District of the Commonwealth of Pennsylvania, presently coterminous with Luzerne County, and the Magisterial District Judges of said Judicial District, *all of which are part of the Unified Judicial System of the Commonwealth of Pennsylvania and not part of the County government.*

(Doc. 47-4, at § 6.05.A (emphasis added)).[4] Previous decisions in the Middle District of Pennsylvania have concluded that Court of Common Pleas probation officers "as an arm of the court, are more like judges as state actors than as county actors." *Wallace v. Powell*, 2009 WL 6850318, at *9 (M.D. Pa. 2009) (collecting cases and noting that "[s]imilar to judges, when the Pennsylvania Constitution lists county officers, probation officers are not included in that list") (citing Pa. Const. art. IX, § 4). Because "[t]he probation department is an arm of the state, and its employees are state actors," it is "subject to sovereign immunity"

---

[4] Plaintiff attempts to divert the Court's attention to the following paragraph, § 6.05.B. (*See* Doc. 47-4 at p. 35.) Section 6.05.B. subjects judicial employees to the County's budget appropriations and various other County Codes. The Court cannot, however, read this in isolation from the clear and unequivocal language of the immediately preceding paragraph.

under the Eleventh Amendment. *Clark v. Conahan*, 737 F. Supp. 2d 239, 258 (M.D. Pa. 2010) (citing *Haybarger*, 551 F.3d at 198).

Accordingly, Plaintiffs cannot maintain a claim against Luzerne County, for the simple reason that Luzerne County has no employment relationship with the Plaintiffs. Moreover, to the extent that the Plaintiffs want to proceed in Court against their former employer, they would need to sue the Probation Department, the Court of Common Pleas, or the Commonwealth of Pennsylvania. However, these avenues of redress are foreclosed under the Eleventh Amendment.

Therefore, Plaintiffs' claims must fail as a matter of law, unless there is some other independent basis to hold the County liable, as discussed below.[5]

---

[5] This conclusion is not altered by Plaintiffs' argument that Defendants admitted that Luzerne County was Plaintiffs' employer. Plaintiffs rely for this argument on (1) the deposition testimony of Luzerne County's representative David Parsnik and (2) Defendants' Answer to the Complaint. (Doc. 47 at 2-3). Parsnik did originally respond affirmatively to Plaintiff's counsel's deposition question "You'd agree with me that the Plaintiffs were employed by Luzerne County in 2012 prior to being laid off correct?" (*See* David Parsnik Dep. Doc. 44-4, at 11:17-23.) However, Parsnik later submitted an errata sheet which stated "Change response on page 11 line 23 from "Yeah." to "No. Plaintiffs were employed by the Luzerne County Court of Common Pleas prior to being laid off in 2012." (*Id.*, Errata Sheet, at p. 7.) Federal Rule of Civil Procedure 30(e)(1)(B) specifically authorizes the deponent to make changes to his testimony in this way. *See also In re Chocolate Confectionary Antitrust Litig.*, 2009 WL 2045160, at *2 (M.D. Pa. 2009) ("Rule 30(e) of the Federal Rules of Civil Procedure allows a deponent who reserves the right to review his or her testimony to amend it 'in form or substance' within thirty days following preparation of the deposition transcript.").

Further, Defendants' Answer that Plaintiffs cite was the Answer to Plaintiffs' *original* Complaint. (*See* Answ., Doc. 12, at ¶¶ 1-2). However, this Answer was superseded when Plaintiffs' filed an Amended Complaint, (Doc. 31), and Defendants filed an Amended Answer (Doc. 34). In the Amended Answer, Defendants state that "[i]t is specifically denied that [each Plaintiff] is an employee of the County; rather Plaintiffs are court-appointed employees of the Luzerne County Court of Common Pleas." (Answ. to Am. Compl., Doc. 34, at ¶¶1-2).

Thus, Plaintiff's attempts to construe Parsnik's amended deposition testimony and a superseded Answer as judicial admissions are unavailing and disingenuous.

## B. Joint Employer

If Luzerne County is not found to be Plaintiffs' sole employer, then Plaintiffs claim in

the alternative that it was their joint employer. The starting point for the Court's joint-

employer analysis is *Graves v. Lowery*, 117 F.3d 723 (3d Cir. 1997), where the Third Circuit

took up "a narrow and unique question of employer liability . . . whether [plaintiffs], who are

formally considered employees of the judicial branch of the Commonwealth of

Pennsylvania, are precluded, as a matter of Pennsylvania law, from pursuing a federal

employment discrimination claim against Dauphin County, Pennsylvania." *Graves*, 117 F.3d

at 724. *Graves* involved a sex discrimination claim against Dauphin County brought by

seven former clerks who worked for the Magisterial District located in and funded by the

county. *Id.* at 723-24.

The Third Circuit began its analysis by recognizing that under Pennsylvania law, "the

courts are considered the employers of judicial personnel." *Id.* at 727 (quoting *Cnty. of

Lehigh v. Pennsylvania Labor Relations Bd.*, 489 A.2d 1325, 1327 (1985) ("Since the court

has the inherent right to hire, discharge and supervise, an employer-employee relationship

exists by definition between the judges and their appointees. The fact that those employees

are paid by the county does not alter the court's employer status.")). However, the Circuit

went on to state that "this fact does not preclude the possibility that a county may share co-

employer or joint-employer status with the courts," if the unique facts of a case indicate that

the two in fact acted as joint employers. *Id.* "[A]lthough a court may have the 'inherent right'

15

to hire and fire employees—even though those employees are paid by a county—it may

also have the derivative right to delegate employer-type responsibilities to a county." *Id.* The

Circuit concluded that, in the case before it, the plaintiff clerks had alleged sufficient facts

"which, if proven, would allow them to show that Dauphin County, through its actions, was

the *de facto* co-employer of the Clerks," regardless of the formal relationship. *Id.* at 728.

The Circuit provided several justifications for this conclusion. First, it stated that the

"perhaps most important" allegation was that county employees hired two of the plaintiffs.

*Id.* It stated, "[i]n our view, this asserted fact alone should have precluded the district court

from deciding the matter on a motion to dismiss." *Id.*

Second, the Third Circuit found "it significant that the Clerks were covered by the

County's sexual harassment policy." *Id.*

> It is not disputed that the Clerks understood that they were covered by the
> policy. Indeed, the Clerks drafted a complaint pursuant to the policy and
> submitted it to a County official. Based on these actions, we find it reasonable
> to infer that the Clerks expected the County to have the authority to intervene
> in the situation. This expectation was solidified when the County convened an
> investigative panel and provided the Clerks with counseling services.

*Id.*

Additionally, the Circuit noted the plaintiffs' allegations "that they were told that they

were County employees, that the County investigated their allegation of sexual harassment,

[and] that they were subject to termination and/or reinstatement by the County." *Id.* at 729.

"Although employee expectations are not dispositive of employer status," the Circuit found

them relevant at the motion to dismiss stage. *Id.* at 728-29.

16

"In sum," *Graves* concluded, "the precise contours of an employment relationship can only be established by a careful factual inquiry." *Id.* at 729. The Third Circuit simply found in *Graves* that enough indicia of a joint-employer relationship existed in the Complaint before it to survive a motion to dismiss. *Id.*

*Graves* is distinguishable from the case at bar. First, unlike in *Graves*, there is no evidence that the instant Plaintiffs "were told that they were County employees." *Cf. id.* Second, the Third Circuit stated in *Graves* that the "perhaps most important" factor in its joint-employer analysis was that Dauphin County employees hired two of the plaintiffs. *See id.* at 728. Here, although Plaintiffs filled out job applications that used Luzerne County letterhead, there is no evidence suggesting that the County played any role in the decisions to hire Plaintiffs.

Third, there is no evidence that Plaintiffs "were subject to termination and/or reinstatement by the County." *Cf. id.* To the contrary, the undisputed record evidence demonstrates that the Court of Common Pleas retained the exclusive right to hire and fire Probation employees. Article XVII of the CBA, entitled "Discharge, Demotion, Suspension and Discipline," states,

> The Court retains the sole and exclusive right to discharge, demote, suspend or discipline Employees. All actions taken by the Court pursuant to this Article shall not be subject to grievance and arbitration procedure of this Agreement, but rather shall be taken up in accordance with the Court Policy and Procedure Manual. This Article shall not serve to diminish any Employee rights under law or the Court Policy and Procedure Manual.

(Doc. 47-3 at 12).

17

Under Article XXX, section 3, entitled "Management Right," the CBA states,

> All matters involving the rights of the Court to hire, discipline, discharge, supervise, assign or direct the members of this bargaining unit, are vested exclusively in the Courts and are not subject to any terms or conditions of this collective bargaining agreement.

(*Id.* at 19).

The fact that the County paid the Plaintiffs' salaries and acted as a party to the CBA cannot undo the conclusion, based on the clear wording of the above sections, that the Common Pleas Court retained the sole right to hire and fire the Plaintiffs and therefore acted as their sole employer. *See Walters v. Washington Cnty.*, 2009 WL 793639, at *12 (W.D. Pa. 2009) ("Consistent with the *Graves* decision, plaintiff being paid by the County is insufficient to impose co-employer status on it. Even if plaintiff was covered by the collective bargaining agreement with regard to her wage rates and benefits, these issues deal strictly with plaintiff's pay and would not interfere with the Court of Common Pleas' sole right to hire or fire."), *aff'd*, 415 F. App'x 374 (3d Cir. 2011); *cf. also Graves*, 117 F.3d at 724 (discussing historical background of county-funded court salaries and characterizing this funding scheme as "contrary to the idea of a 'Unified Judicial System'" which was in the process of being changed by Pennsylvania Supreme Court order).

This conclusion is buttressed by a review of 16 Pa. Cons. Stat. Ann. § 1620, which provides for the fixation of "salaries and compensation of county officers." That statute gives the county commissioner "the sole power and responsibility to represent" all judicial officers

18

"having any employment powers over the affected employes" in proceedings before "the Pennsylvania Labor Relations Board or collective bargaining negotiations." 16 Pa. Cons. Stat. Ann. § 1620. However, it goes on to specifically provide that "[t]he exercise of such responsibilities by the county commissioners shall in no way affect the hiring, discharging and supervising rights and obligations with respect to such employes as may be vested in the judges or other county officers." *Id.* This reservation of rights, read in conjunction with the CBA's explicit vesting of such powers in the Court, *see* p. 17-18, *supra*, demonstrates that the fact that the County, as opposed the Court of Common Pleas, entered into the CBA with the Association in no way indicates that the Common Pleas Court shared its rights to terminate and/or reinstate employees with the County. Moreover, the County Commissioners' status as collective bargaining representatives for judicial personnel cannot signify a delegation of the Court's "employer-type responsibilities" in light of section 1620 and the CBA.

For the same reasons, the fact that it was the County that denied Plaintiffs' grievance and participated in the arbitration hearing does not suggest joint employer status. Unlike in *Graves*, where Dauphin County injected itself into court employment matters by convening an investigative panel and providing plaintiffs with counseling services, 117 F.3d at 728, here, the County did not assume the Court's "employer-type responsibilities." In responding to Plaintiffs' grievance, the County merely acted in its statutorily required role as the collective bargaining representative for Common Pleas Court employees. Moreover, the

19

County, as paraphrased by the arbitrator, maintained during the arbitration proceedings that Grievants' claims were nonarbitrable because "[t]he relevant provisions of the [Collective Bargaining] Agreement are unambiguous. Article XVII explicitly provides that the Court retains the sole and exclusive right to discharge employees . . . ." (*See* Doc. 44-13 at 9). Thus, far from assuming "employer-type responsibilities" by responding to Plaintiffs' grievances, the County actually reaffirmed the Court's exclusive authority to hire, fire, and supervise its employees during the grievance proceedings.

Fourth, although the Third Circuit in *Graves* found "it significant that the Clerks were covered by the County's sexual harassment policy," 117 F.3d at 728, the existence of a County personnel policy here does not indicate that the County was a joint employer.[6] The Luzerne County Personnel Code states that it covers "all persons as promulgated under § 7.02 of the Luzerne County Home Rule Charter." (Defs.' Reply Br. App., Ex. B, Doc. 52-2, at § 1001.01). The Home Rule Charter provides that the County's Personnel Code applies to judicial personnel, but it also states that the Code only applies to "the extent it does not interfere with the inherent and constitutional rights and powers possessed by the Judiciary to do all things as are reasonably necessary for the administration of justice, including, but not necessarily limited to, the power to hire, fire, and supervise Court-appointed personnel." (Pls.' Ex. C, Doc. 47-4, at §§ 6.05.B). Thus, the Luzerne County Personnel Code, read in

---

[6] Plaintiffs do not provide a copy of the Luzerne County Personnel Code. However, Defendants do attach the Code, which indicates that it was not adopted until April 10, 2012 and was not effective until May 10, 2012—after Plaintiffs were furloughed. (*See* Defs.' Reply Br. App., Ex. B, Doc. 52-2, at p. 1). Even if the Court overlooks this fact and assumes the Code applies to the Plaintiffs, it does not support their claims, as discussed below.

conjunction with the County's Home Rule Charter, also expressly recognizes the Common

Pleas Court's exclusive authority to hire, fire, and supervise its employees.

Further, the Common Pleas Court has its own Human Resource Director and its own

Human Resource Policy and Procedure Manual. (*See generally* Ct. of Common Pleas of

Luzerne Cnty. H.R. Pol'y & Proc. Manual, Defs.' Ex. I, Doc. 44-9). The Manual states:

> It is recognized that the County of Luzerne has established human resource policies and procedures for county employees. Where the county policy is not inconsistent with the integrity and independence of the judiciary, and not inconsistent with the provisions of this manual, the law and other court policies, the court shall adopt such policy pending the adoption of a policy on the same subject matter by the court. The application of county policies to court employees shall be determined by the District Court Administrator under the direction of the President Judge.

(*Id.* at § 103). Thus, the Human Resource Manual makes clear that the Luzerne County

Personnel Code only binds court employees insofar as it is not inconsistent the

independence of the judiciary and other court policies. Accordingly, the Luzerne County

Personnel Code cannot override the statements in the other Common Pleas policy

documents, discussed above, which reserve all "employer-type responsibilities" as the

exclusive prerogative of the Court.

For all of these reasons, *Graves* is clearly distinguishable from the case at bar, which

contains evidence of many clear policy statements reserving for the Common Pleas Court

exclusive authority in judicial employment decisions. Thus, its reasoning is not controlling

here.

21

Since *Graves*, the Court of Appeals has not enumerated "a formal test for joint employment under Title VII." *Hollinghead v. City of York*, 11 F.Supp.3d 450, 463 (M.D. Pa. 2014) (adopting Report & Recommendation), *aff'd*, 592 F. App'x 110 (3d Cir. 2015) (affirming District Court orders on the basis of "three thorough and well-reasoned reports and recommendations," for "the reasons that [the issuing Magistrate Judge] explained"). However,

> [w]hen determining whether an entity exercises significant control with another employer, district courts in the Third Circuit have assessed the following factors: (1) the entity's "authority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours;" (2) its "day-to-day supervision of employees, including employee discipline;" and (3) its "control of employee records, including payroll, insurance, taxes and the like."

*Plaso v. IJKG, LLC*, 553 F. App'x 199, 204-05 (3d Cir. 2014) (collecting cases).

Applying these factors, the Court finds that Luzerne County was not Plaintiffs' joint employer as a matter of law. First, while the County funds the Probation Department and the CBA sets forth the terms for judicial employee compensation and benefits, the CBA also makes clear that the Court of Common Pleas "retains the sole and exclusive right to discharge, demote, suspend or discipline Employees." (Doc. 47-3 at art. XVII). The CBA further provides that "[a]ll matters involving the rights of the Court to hire, discipline, discharge, supervise, assign or direct the members of this bargaining unit, are vested exclusively in the Courts and are not subject to any terms or conditions of this collective

22

bargaining agreement." (*Id.* at art. XXX, § 3). Therefore, the first factor weighs against finding that the County was Plaintiffs' joint employer.

Second, the Court supervised the day-to-day operations of the Probation Department. Vecchio, the Probation Director, performed his duties under the supervision of the Court. (*See* Vecchio Dep. at 23:6-8; Director of Probation Services Job Description, Defs.' Ex. E, Doc. 44-5, at 1 ("Work is performed under the general supervision of the Court . . . ."). His immediate supervisor was Shucosky, the Court Administrator, and Shucosky's supervisor was the President Judge of the Court of Common Pleas. (Vecchio Dep. at 23:6-8).[7] Moreover, the CBA states that the Court "retains the sole and exclusive right to discharge, demote, suspend or discipline Employees." (Pls.' Ex. B, Doc. 47-3, Article XVII). Therefore, the second factor weighs heavily against finding that the County was Plaintiffs' joint employer.

With regard to the third factor, Plaintiffs aver that Luzerne County was in possession of their personnel records and a seniority list for Probation Department employees. But Plaintiffs make these allegations without a sufficient factual basis. Although Plaintiffs produce copies of their job applications on Luzerne County letterhead, (*see* Doc. 47-2), and a document entitled "Luzerne County Department of Probation Services Seniority List Oct – 2011," (*see* Doc. 47-5), these documents, on their own, do not demonstrate who in fact

---

[7] Plaintiffs deny these averments, as they are recounted in Paragraphs 5 through 7 of Defendants' Statement of Facts. (*See* Doc. 48 at ¶¶ 5-7). However, Plaintiffs do not produce evidence of their own contradicting this evidence of record, except for what has already been discussed and rejected in this Opinion. As such, the Court accepts the statements as uncontradicted and, indeed, as supported by the record evidence cited.

maintained the Department's personnel records. Titles alone are not indicative of physical custody, when all other evidence indicates that the Court maintained sole employer status. Indeed, the only evidence discussing the maintenance of such records is Vecchio's deposition testimony. Vecchio testified that the Probation Department's Administrative Services Division maintained the seniority list and documentation as to "payroll matters and hours worked." (Vecchio Dep. at 21:21-22:1).[8] Therefore, the third factor weighs against finding that the County was Plaintiffs' joint employer.

In sum, all of the relevant factors weigh against finding that the County was Plaintiffs' joint employer. Because Plaintiffs fail to proffer evidence to raise a genuine issue of material fact on this issue, their claims against Luzerne County cannot survive summary judgment.[9]

## C. Plaintiffs' Claims Also Fail on Their Merits

Even if Luzerne County could be considered, albeit counterfactually, to stand in some type of employment relationship to the Plaintiffs, summary judgment would still be appropriate on the gender discrimination claims, because Plaintiffs have failed to produce evidence that Defendants treated them differently due to their gender.

---

[8] Plaintiffs deny the truth of this statement. (Doc. 48 at ¶ 17). However, their denial is subject to the same problems as discussed in note 7, *supra*. Accordingly, the statement is accepted as uncontradicted.

[9] The Court does not find persuasive Plaintiffs' citations to *Amoroso v. Bucks County Court of Common Pleas*, 2014 WL 1284791 (E.D. Pa. 2014), or to their various employment documents, (Pls.' Exs. N-T, Docs. 44-14 to 44-21). First, *Amoroso* is distinguishable from the case at bar. The key factors discussed in *Amoroso*, such as the plaintiff alleging sufficient facts to show a joint-employment relationship, are not present here. 2014 WL 1284791 at *10. Second, the various documents Plaintiffs' cite relate to Plaintiffs' pay and benefits. The fact that the County provided Plaintiffs with their pay and benefits, pursuant to the CBA, does not detract from the Common Pleas Court's exclusive right to hire, fire, and discipline judicial employees. *See Walters*, 2009 WL 793639, at *12 (noting that factors that relate to pay and benefits "would not interfere with the Court of Common Pleas' sole right to hire or fire").

Moreover, Plaintiffs also sue Michael Vecchio individually for a violation of the PHRA
(and seemingly also under Title VII and section 1983, insofar as Count I alleges all of these
claims generally without naming particular Defendants). (*See* Am. Compl., Doc. 31 at pp. 5-
7). Because Vecchio is sued in his individual capacity, the facts that, as Probation Director,
he is not a Luzerne County employee and the Eleventh Amendment bars claims against his
true employer, the Court of Common Pleas, do not by themselves preclude the lawsuit
against him. Nonetheless, the Court concludes that each of the claims against Vecchio
individually fails on its merits as well.

The Court will now discuss these merits of Plaintiffs' Title VII, PHRA, and Section
1983 Equal Protection claims, *seriatim*, both as they apply to Plaintiffs' employer and as
they apply to Defendant Vecchio.

### 1. Title VII and the PHRA

Title VII of the Civil Rights Act of 1964 and the PHRA both prohibit an employer from
discharging an employee on the basis of the employee's membership in certain protected
categories, including gender. 42 U.S.C. § 2000e–2(a); 43 P.S. § 955(a). There is no need to
treat the Title VII and the PHRA claims separately, because the PHRA is construed
consistently with Title VII. *See Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083-
84 (3d Cir. 1995); *Eldridge v. Municipality of Norristown*, 514 F. App'x 187, 189 n.2 (3d Cir.
2013).

To prove a gender discrimination claim when, as here, there exists no direct

evidence of discrimination, Plaintiffs must satisfy the three-step burden-shifting analysis set

forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03, 93 S. Ct. 1817, 1824, 36

L. Ed. 2d 668 (1973). *See Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013).[10]

> *McDonnell Douglas* requires the plaintiff to shoulder the initial burden to make
> out a *prima facie* case of discrimination. If the plaintiff meets this requirement,
> the burden of production shifts to the defendant to articulate a legitimate, non-
> discriminatory rationale for the employment action. Should the defendant
> satisfy its burden, the presumption of discriminatory action is rebutted and the
> plaintiff must demonstrate that the defendant's stated reasons are pretextual.

*Wood v. Univ. of Pittsburgh*, 395 F. App'x 810, 814 (3d Cir. 2010) (citing *Wishkin v. Potter*,

476 F.3d 180, 185 (3d Cir. 2007)).

At the first step, Plaintiffs must establish a *prima facie* case of gender discrimination

by demonstrating that: (1) they were members of a protected class; (2) they were qualified

for their positions; (3) they suffered adverse employment actions; and (4) members of the

---

[10] Although Plaintiffs limit their arguments to considerations relevant to a *McDonnell Douglas* analysis, Plaintiffs assert that "they have brought forth direct evidence of sexist animus when Defendant Vecchio stated that Plaintiffs did not have as much field experience as the males who had less seniority and were retained." (Doc. 47 at 12 n.1). Evidence of discrimination qualifies as direct when "it demonstrates that the 'decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.'" *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 513 (3d Cir. 1997) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S. Ct. 1775, 1805, 104 L. Ed. 2d 268 (1989) (O'Connor, J., concurring). "Thus, direct evidence must meet two requirements: First, the evidence must be strong enough 'to permit the factfinder to infer that a discriminatory attitude was more likely than not a motivating factor in the [defendant's] decision.' Second, the evidence must be connected to the decision being challenged by the plaintiff." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 269 (3d Cir. 2010) (quoting *Walden*, 126 F.3d at 513, 515-16). The Third Circuit has described "these requirements as creating a 'high hurdle' for plaintiffs." *Id.* (quoting *Walden*, 126 F.3d at 513). Given this "high hurdle," the Court fails to see how Vecchio's alleged remarks may be considered direct evidence of gender discrimination. The CBA does not require discharges to be based on field experience. Indeed, field experience is only one of several considerations that could reasonably influence the discharge decision. Thus, whatever the evidentiary value of Vecchio's statement may be, it surely does not on its own allow the factfinder to "infer that a discriminatory attitude was more likely than not a motivating factor" in the furlough decision.

opposite sex were treated more favorably. *Burton*, 707 F.3d at 426. "To satisfy the fourth

element of the prima facie case where, as here, the basis of a plaintiff's claim is an

employment termination conducted in the context of a reduction in force, [they] must present

evidence that similarly situated persons outside of [their] protected class were retained."

*Jackson v. Temple Univ. Hosp., Inc.*, 501 F. App'x 120, 122 (3d Cir. 2012) (collecting

cases).

The Court finds that Plaintiffs have adduced enough evidence to establish a prima

facie case of gender discrimination. Plaintiffs are women. They were furloughed, while male

probation officers were retained. There is no dispute that Plaintiffs were qualified.

Since Plaintiffs can establish a prima facie case of discrimination, the burden of

production shifts to Defendants to proffer a legitimate non-discriminatory reason for the

furloughs. *See Burton*, 707 F.3d at 426. "This burden is relatively light and is satisfied if the

employer provides evidence, which, if true, would permit a conclusion that it took the

adverse employment action for a non-discriminatory reason." *Id.* (internal quotation marks

omitted). "At this stage, 'the defendant need not prove that the articulated reason actually

motivated its conduct.'" *Id.* (quoting *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183,

189 (3d Cir. 2003)).

Here, Defendants can meet this light burden. According to Defendants, the decision

to lay off probation officers was borne out of financial necessity. Defendants claim that

Vecchio's reduction in force recommendation "was based on the operational needs of the

Department of Probation Services." (Doc. 42 at ¶ 23). Among the factors Vecchio

considered were "the skills, years of experience, including field experience, and credentials"

of the probation officers. (Id.). However, according to Defendants, the determinative factor in

making his recommendation to furlough Plaintiffs, along with three male probation officers,

was their lack of CTUF training, as discussed in more detail above.

Since the Defendants offer a legitimate non-discriminatory reason for furloughing

Plaintiffs, "the burden of production [shifts] back to [Plaintiffs] to provide evidence from

which a factfinder could reasonably infer that the employer's proffered justification is merely

a pretext for discrimination." Burton, 707 F.3d at 426. "The plaintiff must make this showing

of pretext to defeat a motion for summary judgment." Id. "To make a showing of pretext, 'the

plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could

reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe

that an invidious discriminatory reason was more likely than not a motivating or

determinative cause of the employer's action.'" Id. at 427 (quoting Fuentes v. Perskie, 32

F.3d 759, 764 (3d Cir. 1994)).

Plaintiffs proffer two arguments in support of their position that Defendants' stated

rationale for the reduction in force determination is a pretext for gender discrimination. First,

they argue that "Vecchio did not offer the 'Control Tactics' certification training to any

woman Probation Officer, including both Plaintiffs." (Doc. 47 at 15). In so arguing, Plaintiffs

appear to be attempting to manipulate the undisputed record to create an issue of fact

28

where none exists. It is undisputed that all of the probation officers furloughed, male and female alike, lacked CTUF training certification. Further, there is no dispute that Probation Officers Buss and Kijek, who were retained and who Plaintiffs claim had less seniority, had CTUF training certification. (See CTUF Certifications, Pls.' Ex. M, Doc. 47-14, at 5-6.)

Moreover, contrary to Plaintiffs' arguments, there is no evidence of record that Defendants denied Plaintiffs, or any other female probation officers, the opportunity to attain CTUF training certification. Plaintiffs' only support for this contention comes from their Exhibit M (Doc. 47-14) and Rebovich's affidavit (Doc. 47-1). Exhibit M consists of several CTUF training certifications for male probation officers. However, the fact that several men attained CTUF training certification does not show that women were excluded from attaining certification. Plaintiffs do not argue, nor provide any evidence, that they, or any other female probation officers, sought a CTUF training certification. Nor do Plaintiffs proffer evidence that Defendants denied them opportunities to attain certification or otherwise discouraged or precluded them from seeking it.

Plaintiffs also point to Rebovich's affidavit in which she states, "[w]omen were never offered the Control Tactics and Use of Force training to be a certified instructor during my tenure with the Luzerne County Probation Department." (Doc. 47-1 at ¶ 7). Implicit in this averment is the supposition that men were offered CTUF training certification. However, Plaintiffs proffer no evidence in support of this further proposition. The record evidence demonstrates that no one was "offered" CTUF training certification. Instead, Vecchio

testified during his deposition that officers volunteered for the training. (Vecchio Dep. at

43:9-45:9, 82:7-25). Vecchio testified,

> [A]s I stated earlier, we've had volunteers [for CTUF training certification]. It's been a process that's been in place for many more years since I've been doing this job. And where there's been a need for one there's been a volunteer to fill the slots. There's not been a need to post or request somebody to do that.

Q.   You were also asked whether or not any female, and in particular Ms. Caso or Ms. Rebovich-Guesto, ever volunteered to become certified to train.

Did you or did anybody in the Luzerne County court system prevent either Ms. Caso or Ms. Rebovich-Guesto from volunteering to become a certified trainer?

ATTY. POLLICK:   Objection. Lack of personal knowledge.

A.   Well, certainly I never restricted them from volunteering or prevented them from volunteering.

(Id. at 82:7-25).

Thus, the record does not support Plaintiffs' attempted inference that Defendants

prohibited or prevented female probation officers from volunteering for CTUF training

certification. To the extent they claim that such was the case, they rely only on conjecture.[11]

---

[11] Plaintiffs repeatedly attack Vecchio's deposition testimony as self-serving. (See, e.g., Doc. 48 at ¶¶ 45-48). They rely on Bhaya v. Westinghouse Electric Corp., 832 F.2d 258, 262 (3d Cir. 1987), for the proposition that "when oral testimony is the only evidence that is proffered as to [an employer's] legitimate reason" for termination under McDonnell Douglas, a jury question exists because the jury could always be free to disbelieve the testimony. (See id.) In fact, however, the decision in Bhaya merely held that it was inappropriate for a district court to overturn a jury verdict based solely on oral testimony that the district court credited but that the jury apparently did not. Bhaya, 832 F.2d at 261-63. A different standard of review applies to the present Motion for Summary Judgment than in a motion challenging a jury verdict. Here, even when viewing all testimony in the light most favorable to the Plaintiff, it is still apparent that (1) Plaintiffs can point to no non-conjectural record evidence that this Opinion has not already addressed and

This conclusion is not altered by Paragraph 27 of Plaintiffs' Statement of Facts.

Paragraph 27 cites portions of Caso's deposition testimony. In the cited passages, Plaintiffs'

counsel, in essence, testifies for Caso by asking her client leading questions. Plaintiffs'

counsel testified that Vecchio failed to disclose to female probation officers opportunities to

attain CTUF training certification. (Caso Dep. at 127:7-128:6, 142:19-144:7).

Rule 611(c) of the Federal Rules of Evidence provides that "[l]eading questions

should not be used on direct examination except as necessary to develop the witness's

testimony." Rule 30 of the Federal Rules of Civil Procedure provides that "[t]he examination

and cross-examination of a deponent proceed as they would at trial under the Federal Rules

of Evidence, except Rules 103 and 615." Fed. R. Civ. P. 30(c)(1). Rule 30 also states, "[t]he

court may impose an appropriate sanction—including the reasonable expenses and

attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the

fair examination of the deponent." Fed. R. Civ. P. 30(d)(2).

During the course of Caso's deposition, the following exchanges occurred between

Caso and her counsel:

> Q.   And then this great exhibit, Caso-22, could you tell me if there's one
>      woman in this listing of all the people who have certifications in this
>      control tactic instructor certification, is there one woman that got this
>      training in Caso-22?
>
> A.   Not to my knowledge.

---

discounted in support of their claims and (2) all evidence—whether oral testimony or otherwise—suggests
that the furlough decisions were non-discriminatory.

MR. BUFALINO:      Object to the form.

THE WITNESS:      I never in all my years at the county have ever been trained by a woman with this certification.

BY MS. POLLICK:

Q.      And you look at 22, it's all men. There's no woman's name. If you want to briefly go through it, is there a woman there that has had this training?

A.      There is not.

Q.      And this is more grounds for gender discrimination because you as a female were never offered what these boys were offered, right?

MR. BUFALINO:      Object to the form.

THE WITNESS:      Right.

BY MS. POLLICK:

Q.      Another act of discrimination, right?

MR. BUFALINO:      Object to the form.

THE WITNESS:      Yes.

(Caso Dep. at 127:7-128:6).

Q.      And this training, Mr. Vecchio never came to you and said, honey— well, he probably shouldn't call you honey, but Jen, do you want to go for this training? I got a training session, and since you've been such— an employee been here so long, I want you to go.

MR. BUFALINO:      Object to the form.

You can answer.

THE WITNESS:      He did not.

32

BY MS. POLLICK:

Q.   You cannot be aware of something you don't know about it [sic]?

     MR. BUFALINO:   Object to the form.

     You can answer.

     THE WITNESS:   I cannot be aware.

BY MS. POLLICK:

Q.   If a training session is going to occur and he keeps it tight lipped so he
     can send his boys who he wants to go, you'd be none the wiser until
     you see that they're missing because they're at training, right?

     MR. BUFALINO:   Object to the form.

     THE WITNESS:   I cannot be aware.

BY MS. POLLICK:

Q.   And Mr. Vecchio or anyone within Luzerne County never came to you
     and made you aware that there was a training opportunity that you
     could have taken to be just like the people who came after you?

A.   They never came to me.

Q.   They never posted training so that all the employees have fair shots to
     get the training, right?

A.   They did not.

     MR. BUFALINO:   Object to the form.

     THE WITNESS:   That's correct.

BY MS. POLLICK:

33

Q.    Sign up if you want the training, did they do that?

A.    They did not.

(Id. at 142:19-144:7).

The Third Circuit has stated that "it is generally improper for [an] attorney to employ

leading questions" when "pos[ing] questions to a friendly witness during a direct

examination." Jarbough v. Attorney Gen. of U.S., 483 F.3d 184, 192 (3d Cir. 2007) (citing

Fed. R. Evid. 611(c)).

> Leading questions are undesirable in this context because of their suggestive
> power. The "search for the truth," Nix v. Whiteside, 475 U.S. 157, 171, 106 S.
> Ct. 988, 89 L. Ed. 2d 123 (1986), in our adjudicatory system is best served
> when the finder of fact considers the testimony of the friendly witness based
> upon his or her recollection, not the testimony of counsel calling the witness.
> Suggesting answers to the friendly witness may "supply a false memory for
> the witness—that is, to suggest desired answers not in truth based upon real
> recollection." 3 John Henry Wigmore, Evidence § 769, at 154 (Chadbourne
> Rev. 1970). See Hall v. Clifton Precision, 150 F.R.D. 525, 531 (E.D. Pa.
> 1993) ("It should go without saying that lawyers are strictly prohibited from
> making any comments, either on or off the record, which might suggest or
> limit a witness's answer to an unobjectionable question.").

Id. at 192-93.

In a factually distinct, but nonetheless analogous, decision, the District Court for the

Eastern District of Pennsylvania took up the issue of witness-coaching during depositions.

See generally Hall, 150 F.R.D. 525. Hall involved an attorney who sought to confer with his

client while the client was being deposed and to take recesses for such conferences to

occur. Id. at 526. The court in Hall held that these practices (as well as the practice of

interposing objections that "suggest or limit a witness' answer to an unobjectionable

34

question") were inappropriate and abused the deposition process. *See id.* at 530-31. The

court observed,

> The underlying purpose of a deposition is to find out what a witness saw,
> heard, or did—what the witness thinks. A deposition is meant to be a
> question-and-answer conversation between the deposing lawyer and the
> witness. There is no proper need for the witness's own lawyer to act as an
> intermediary, interpreting questions, deciding which questions the witness
> should answer, and helping the witness to formulate answers. *The witness
> comes to the deposition to testify, not to indulge in a parody of Charlie
> McCarthy, with lawyers coaching or bending the witness's words to mold a
> legally convenient record. It is the witness—not the lawyer—who is the
> witness.* As an advocate, the lawyer is free to frame those facts in a manner
> favorable to the client, and also to make favorable and creative arguments of
> law. But the lawyer is not entitled to be creative with the facts. Rather, a
> lawyer must accept the facts as they develop.

(*Id.* at 528 (emphasis added)).

Here, in the passages of Caso's testimony excerpted above, Plaintiffs' counsel

similarly abused the deposition process by asking leading questions. Much of the excerpted

testimony is simply Caso confirming her counsel's "questions" without Caso providing any

independent testimony of her own. As a result, rather than Caso recounting her

observations—the proper purpose of a deposition—Plaintiffs' counsel attempted to "suggest

answers to the witness" and "mold a legally convenient record."

Thus, Plaintiffs' use of leading questions in deposing her client violated Federal Rule

of Evidence 611, "frustrate[d] the fair examination of the deponent," Fed. R. Civ. P. 30(d)(2),

and was entirely inappropriate. Defendants' counsel properly objected to the form of

opposing counsel's questions. Accordingly, the Court will sustain those objections and strike

from the record those portions of Caso's deposition testimony in which she responded to

her counsel's leading questions.[12] Further, the Court observes that Plaintiffs' counsel has

engaged in the same sort of inappropriate deposition questioning in other cases before the

undersigned. *See, e.g., Davis v. Fox*, 3:12-CV-1660 (M.D. Pa.). Plaintiffs' counsel is now on

notice that if she continues to use leading questions while deposing friendly witnesses, the

Court "may impose [further] appropriate sanction[s]—including the reasonable expenses

and attorney's fees incurred by any party." *See* Fed. R. Civ. P. 30(d)(2).

Plaintiffs' second pretext argument is that Vecchio's rationale for recommending

Plaintiffs be furloughed changed over time. According to Plaintiffs, Vecchio initially stated

that his reduction-in-force recommendation was predicated upon field experience. In

support of this assertion, Plaintiffs cite Rebovich's deposition testimony in which she states,

> A.     I do remember hearing someone ask a question, why are these males
>        being retained with less seniority, and Mike Vecchio said because they
>        had more field experience.
>
> Q.     Do you know who said why are these male employees being retained?
>
> A.     I'm not sure which probation officer said that, no.

(Rebovich Dep. at 39:6-13).

Further, Plaintiffs point to Defendants' answer to the complaint Caso filed with the

Pennsylvania Human Relations Commission ("PHRC"). (*See* Luzerne County Answ. to

---

[12] Omitting these aspects of the excerpted testimony, what remains is Caso's statement that she was never trained by a woman with a CTUF training certification. (Caso Dep. at 127:14-16). This statement is insufficient for Plaintiffs to avoid summary judgment since it does not show that female probation officers were in any way prohibited from attaining CTUF training certification.

Complainant's PHRC Compl., Pls.' Ex. J, Doc. 47-11). In their answer to the PHRC

complaint, Defendants state that the furloughs were "solely based upon budgetary reasons

and the existence of more experienced and more highly trained probation officers." (Id. at ¶

11). However, this answer and Rebovich's testimony are consistent with Defendants'

proffered legitimate non-discriminatory reason for the layoffs. While Defendants maintain

that CTUF training certification was a factor in Vecchio's recommendation, (Doc. 42 at

¶ 54), they claim that Vecchio also considered "the operational needs of the Department of

Probation Services, vis-à-vis, the skills, years of experience, including field experience, and

credentials of the officers of the Department of Probation Services," (id. at ¶ 23).

Indeed, the undisputed record reflects that aside from Probation Officers Buss, Frank

and Kijek, who had CTUF training certification, the Court furloughed probation officers

based on seniority. (See generally Doc. 47-5). Moreover, it is undisputed that when Vecchio

faxed his recommendation to the Common Pleas Court Administrator, he wrote "trainer"

next to Buss, Frank and Kijek's names. (Michael Vecchio Recommendations, Defs.' Ex. AA,

Doc. 44-27). Finally, there is no dispute that not only were male probation officers laid off

along with Plaintiffs but also that female probation officers were retained. (See id.; Doc. 47-

5). Under these circumstances, no reasonable jury could conclude that Defendants'

proffered rationale for furloughing Plaintiffs was a pretext for gender discrimination.

Therefore, Plaintiffs Title VII and PHRA claims against Luzerne County cannot survive

summary judgment.

These claims also fail against Vecchio individually, since individuals cannot be held liable under Title VII and cannot be held liable under the PHRA where there is no predicate offense. As to the former, "Third Circuit jurisprudence is clear that Title VII does not subject individual supervisory employees to liability: 'Congress did not intend to hold individual employees liable under Title VII.'" *Gretzula v. Camden Cnty. Technical Sch. Bd. of Educ.,* 965 F. Supp. 2d 478, 484 (D.N.J. 2013) (collecting cases) (quoting *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1078 (3d Cir. 1996)). Therefore, as Plaintiffs' mere supervisor and a Court employee, Vecchio is not subject to suit under Title VII. Of course, even if individual employees could be held liable for discrimination under Title VII, Vecchio still could not be held liable because there is no record evidence that any discrimination actually occurred.

Similar reasoning applies to the PHRA. The PHRA allows any person who may "aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice" to be held individually liable. 43 Pa. Cons. Stat. Ann. § 955(e); *see also Dici v. Com. of Pennsylvania,* 91 F.3d 542, 552 (3d Cir. 1996) (noting that this "section of the PHRA . . . contemplates liability that extends beyond that of Title VII"). "Individual defendants cannot, however, be liable for violations of Section 955(e) if there is no primary violation of the PHRA." *Sampson v. Methacton Sch. Dist.,* 2015 WL 641216, at *20 (E.D. Pa. 2015) (collecting cases). Because, as discussed above, no record evidence exists to show a primary violation of the PHRA, then Vecchio obviously cannot be held liable for

aiding or abetting the commission of *legal* behavior—i.e., for "aiding and abetting" a

justifiable, non-discriminatory reduction in force.

### 2. Section 1983

Plaintiffs' section 1983 claim likewise fails as a matter of law.

> To bring a successful claim under 42 U.S.C. § 1983 for denial of equal
> protection, plaintiffs must prove the existence of purposeful discrimination.
> *Batson v. Kentucky*, 476 U.S. 79, 93, 106 S. Ct. 1712, 1721, 90 L. Ed. 2d 69
> (1986). They must demonstrate that they "receiv[ed] different treatment from
> that received by other individuals similarly situated." *Kuhar v. Greensburg-
> Salem School Dist.*, 616 F.2d 676, 677 n.1 (3d Cir. 1980). Specifically, to
> prove sexual discrimination, a plaintiff must show that any disparate treatment
> was based upon her gender. *Bohen v. City of East Chicago*, 799 F.2d 1180,
> 1186-87 (7th Cir. 1986).

*Andrews*, 895 F.2d at 1478. "The *sine qua non* of any successful Equal Protection claim

under § 1983 is purposeful discrimination." *Williams v. Pa. State Police Bureau of Liquor

Control Enforcement*, 108 F. Supp. 2d 460, 471 (E.D. Pa. 2000). "This is what distinguishes

§ 1983 equal protection claims from Title VII cases; to prevail on a § 1983 claim, a plaintiff

must prove that the defendant intended to discriminate." *Id.* (citing *Washington v. Davis*, 426

U.S. 229, 238-39, 96 S. Ct. 2040, 2047, 48 L. Ed. 2d 597 (1976)). Discriminatory intent may

either be proven directly or "proven indirectly, without a 'smoking gun,' on the 'totality of the

relevant facts,' including disparate impact *if* coupled with some other indicia of purposeful

discrimination." *Commonwealth of Pa. v. Flaherty*, 983 F.2d 1267, 1273 (3d Cir. 1993).

Here, it is clear that, even when viewed in the light most favorable to the Plaintiffs,

the evidence of record does not meet the above standards. Plaintiffs have adduced no

direct evidence of discrimination. Nor does the totality of the relevant facts not permit a factfinder to infer purposeful discrimination indirectly. Male and female probation officers alike were furloughed. In fact, more men were furloughed than women. Vecchio recommended that probation officers with CTUF training certifications be retained and then recommended furloughing those probations officers who lacked CTUF training certification based on experience and seniority. There is nothing in the record to indicate that that decision was improper; indeed, it appears to be a reasonable response to the budget cuts facing the Probation Department. Thus, there is simply nothing in the record suggesting that any employer decisions were indicative of purposeful discrimination. Plaintiffs' speculations to the contrary have already been dismissed as groundless, as discussed above.

The same analysis applies to the section 1983 claim against Vecchio individually. Because there is no evidence of record that anyone engaged in discrimination or acted under the influence of discriminatory motives at all, then Vecchio cannot be held individually liable for what appear from all available evidence to be, in essence, reasonable and non-discriminatory furlough decisions.

Therefore, Plaintiffs' § 1983 claim of gender discrimination, like their Title VII and PHRA claims, fails as a matter of law.

## V. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 41) is **GRANTED**. A separate Order follows.

Robert D. Mariani
United States District Judge